Michael F. ARMSTRONG et al.,
Plaintiffs-Appellees,

v.

Clovis McALPIN et al.,
Defendants-Appellants.

No. 1010, Docket 79–7042.

United States Court of Appeals,
Second Circuit.

Argued June 13, 1979.

Decided Sept. 12, 1979.

J. Robert Lunney, New York City (Michael J. McAllister and James J. DeLuca, Lunney & Crocco, New York City, on brief), for defendants-appellants.

Franklin B. Velie, New York City (Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City, on brief), for plaintiffs-appellees.

The Securities and Exchange Commission (Paul Gonson, Principal Associate Gen. Counsel, John P. Sweeney, Sp. Counsel, Anne C. Flannery, Atty., Washington, D. C., on brief), for amicus curiae.

Before VAN GRAAFEILAND and NEWMAN,* Circuit Judges, and BONSAL, District Judge.**

NEWMAN, Circuit Judge:

This appeal from denial of a motion to disqualify the law firm that represents the plaintiffs raises an important issue of legal ethics: whether and in what circumstances the disqualification of a lawyer because of his prior role as a government lawyer requires the disqualification of his law firm.

Theodore Altman, Esq. served on the staff of the Securities and Exchange Commission from 1967 to October, 1975. For the last three years of his government service Altman was Assistant Director of the Division of Enforcement. Altman supervised and had direct, personal involvement in an SEC investigation of Clovis McAlpin, Capital Growth Company, S.A. (Costa Rica) ("Capital"), and other companies. SEC File No. N.Y.—5035. The investigation resulted in the filing of a complaint by the SEC on September 3, 1974, against McAlpin, Capital, and the other companies. *Securities & Exchange Commission v. Capital Growth Co. (Costa Rica)*, 74 Civ. 3779 (S.D.N.Y.). The complaint sought injunctive relief for violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, and also the appointment of a receiver. On September 24, 1974, Michael F. Armstrong was appointed receiver for Capital by Judge Charles E. Stewart, Jr.

Immediately after leaving the SEC in 1975 Altman became an associate with the New York firm of Gordon Hurwitz Butowsky Baker Weitzen & Shalov, of which he is now a partner. In March, 1976, Armstrong approached David M. Butowsky, a partner of the Gordon firm, and requested the firm to act as litigation counsel. Butowsky promptly pointed out to Armstrong the possible issue that might arise because of Altman's prior role with the SEC in the investigation of Capital and the related companies. Both the law firm and the Receiver studied the matter and ultimately concluded that the firm could represent the Receiver provided appropriate screening procedures were instituted to prevent Altman's participation. This followed the course outlined in Formal Opinion 342 of the Committee on Professional Ethics of the American Bar Association. Acting circumspectly, the firm presented the issue to Judge Stewart, who authorized the Receiver to retain the firm. In pursuance of the procedure suggested in Opinion 342, the firm also presented the issue to the SEC and was informed that the SEC had no objection to the Receiver's retention of the firm provided Altman was screened from any participation. The Receiver then retained the Gordon firm.

---

* Judge Newman was United States District Judge for the District of Connecticut, sitting by designation, at the time of oral argument.

** The Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

On September 17, 1976, the Receiver, represented by the Gordon firm, filed the suit in which the pending controversy has arisen. The suit seeks damages in excess of $24 million for violation of federal securities laws. There is no dispute that the alleged wrongful conduct detailed in the Receiver's complaint substantially overlaps the matters alleged in the SEC's enforcement action. Clovis McAlpin, defendant-appellant, alleged to be the principal beneficiary of the alleged fraud, was served in July, 1977. He and defendant-appellant Capital Growth Real Estate Fund, Inc. obtained extensions of time to appear and plead. On June 2, 1978, on their initial court appearance these two defendants moved to disqualify the Gordon firm because of Altman's prior SEC activity. Other defendants subsequently joined in the motion. The motion was denied by Judge Henry F. Werker on December 5, 1978. From that decision McAlpin and Capital Growth Real Estate Fund, Inc. appeal.[1]

While the standards of conduct governing attorneys practicing in the federal courts are ultimately matters for oversight by the federal judiciary, the American Bar Association's Code of Professional Responsibility has been recognized in this Circuit as a principal source of pertinent guidance. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 n.12 (2d Cir. 1975). Canon 9 of the Code provides: "A lawyer should avoid even the appearance of professional impropriety." Ethical Consideration 9–3 provides: "After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none ex-

ists." Finally, Disciplinary Rule (DR) 9–101(B) provides: "A lawyer shall not accept private employment in a matter in which he had a substantial responsibility while he was a public employee."

It is acknowledged in this case that Altman's activity with the SEC in connection with the Capital investigation disqualifies him from the Receiver's lawsuit. The issue is whether the disqualification extends to his law firm.

Prior to 1974, DR 5–105(D) provided that affiliated lawyers were disqualified whenever the lawyer in question was disqualified by DR 5–105, which concerns conflict of interests. At the February, 1974 mid-year meeting of the ABA, DR 5–105(D) was broadened to disqualify affiliated lawyers when the lawyer in question is disqualified by any of the disciplinary rules. The amended version provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment."

Though the textual relationship between DR 9–101(B) and amended DR 5–105(D) seems evident, it has been reported that the ABA committee that proposed the amendment did not consider the impact upon firms that included former government lawyers. Moskowitz, *Can D. C. Lawyers Cut the Ties that Bind?* Juris Doctor (Sept. 1976), at 34.[2] Shortly after DR 5–105(D) was amended, the ABA's Committee on Ethics and Professional Responsibility was asked to consider the impact of the amended Disciplinary Rule on DR 9–101(B). On November 24, 1975, the Committee issued Formal Opinion 342, 62 A.B.A.J. 517 (1975). Opinion 342 concludes that a lawyer's disqualification under DR 9–101(B) does not

---

1. Denial of a motion to disqualify counsel remains appealable, *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 496 F.2d 800 (2d Cir. 1974) (*en banc*), despite "rumbles of discontent," *Board of Education v. Nyquist*, 590 F.2d 1241, 1247, n.8 (2d Cir. 1979).

2. It seems evident that the broadening of DR 5–105(D) was not intended to require law firm

disqualification in every instance where a lawyer in the firm is disqualified by a disciplinary rule. For example, DR 2–110(B)(3) requires a lawyer to withdraw from employment if his "mental or physical condition renders it unreasonably difficult for him to carry out the employment effectively."

inevitably extend to his law firm. The Opinion requires "screening measures" that will "effectively isolate the individual lawyer from participating in the particular matter and sharing in the fees attributable to it." *Id.* at 521. The Opinion permits the firm to accept or continue representation if the government agency with which the attorney in question was formerly employed approves the screening procedures and is satisfied that there is "no appearance of significant impropriety affecting the interests of the government." *Ibid.* In addition, the law firm must make "its own independent determination as to the absence of particular circumstances creating a significant appearance of impropriety." *Ibid.*

The issue has also received additional thoughtful consideration. The Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York has issued Opinion No. 889, agreeing with the ABA Opinion that for most cases screening of the former government lawyer will afford adequate protection. 31 The Record 552 (1976). The New York City Bar Opinion, however, would not leave the adequacy of screening procedures to the government agency, but would require approval by the tribunal before which the private lawsuit is pending. *Id.* at 566. In the District of Columbia, a draft report of the Committee on Legal Ethics of the District of Columbia Bar initially expressed the view that screening procedures could not suffice to prevent disqualification of a firm with which an attorney disqualified by DR 9–101(B) was affiliated. See *Tentative Draft Opinion for Comment, Inquiry 19,* District Lawyer (Fall 1976), at 39. Later the D.C. Committee recommended amendments to the Code that would permit screening when approved by the government agency that employed the disqualified attorney. District Lawyer (Aug.-Sept. 1978), at 44. Recently the Board of Governors of the D.C. Bar has recommended to the District of Columbia Court of Appeals adoption of Code amendments that would permit screening subject to challenge in court, but without the need for approval by the government agency. District Lawyer (Apr.-May 1979), at 47. That proposal is awaiting consideration by the District of Columbia Court of Appeals. Support for screening procedures has also been expressed to the D.C. Bar by the SEC, the Internal Revenue Service, and the Department of Justice, and the SEC supports that position in its *amicus* brief filed in this case.

In the courts disqualification of a lawyer because of his prior government employment on a related matter has been strictly enforced under DR 9–101(B), *General Motors Corp. v. City of New York,* 501 F.2d 639 (2d Cir. 1974); *Telos, Inc. v. Hawaiian Telephone Co.,* 397 F.Supp. 1314 (D.Haw. 1975); *Handelman v. Weiss,* 368 F.Supp. 258 (S.D.N.Y.1973); see also *United States v. Ostrer,* 597 F.2d 337 (2d Cir. 1979); *Traylor v. City of Amarillo, Texas,* 335 F.Supp. 423 (N.D.Tex.1971); and under its predecessor, Canon 36 of the former Canons of Professional Ethics, *Allied Realty, Inc. v. Exchange National Bank,* 408 F.2d 1099 (8th Cir.), *cert. denied,* 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969); *United States v. Trafficante,* 328 F.2d 117 (5th Cir. 1964); *Hilo Metals Co. v. Learner Co.,* 258 F.Supp. 23 (D.Haw.1966); *Empire Linotype School, Inc. v. United States,* 143 F.Supp. 627 (S.D. N.Y.1956). Since disqualification of a lawyer normally disqualifies his firm, *Cinema 5, Ltd. v. Cinerama, Inc., supra,* 528 F.2d at 1387; *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1128–29 (5th Cir. 1971); *Laskey Brothers v. Warner Brothers Pictures,* 224 F.2d 824, 826 (2d Cir. 1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956), disqualification under DR 9–101(B) has been extended to the former government lawyer's firm, *Telos, Inc. v. Hawaiian Telephone Co., supra; Handelman v. Weiss, supra;* see also *Traylor v. City of Amarillo, Texas, supra,* with one notable exception, *Kesselhaut v. United States,* 555 F.2d 791 (Ct.Cl.1977), to be discussed *infra.*

In the pending case, both sides seek to draw support from observations in two recent disqualification decisions of this Court. In *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225 (2d Cir. 1977),

a firm resisting disqualification, which it faced because of a conflict of interest between some of its lawyers, contended that the lawyers with conflicting interests were effectively screened from each other. This Court rejected the use of a screening arrangement. "Morgan Lewis argued below that it built a Chinese Wall within the firm and that no information passed between the two groups of attorneys and thus that no confidential information was disclosed. The court below found that no such 'Chinese Wall' could be created in a single firm. We incline to agree." *Id.* at 229 n.10; see also *Cinema 5, Ltd. v. Cinerama, Inc., supra,* 528 F.2d at 1387 n.1. Screening, appellants contend, has been prohibited.

Appellees, on the other hand, draw comfort from *Board of Education v. Nyquist,* 590 F.2d 1241 (2d Cir. 1979), in which an attorney was sought to be disqualified under the general "appearance of impropriety" standard of Canon 9. The attorney for parties on one side of the dispute was paid in part by a portion of union dues contributed by the opposing parties. This Court reversed the order of disqualification, finding no risk that the circumstances concerning use of union dues would taint the trial. Courts were advised to be "quite hesitant" to disqualify an attorney unless his continued representation would taint the trial by risking violation of the conflict of interest standards of Canons 5 and 9, or the confidentiality standards of Canons 4 and 9. *Id.* at 1246. Disqualification, appellees contend, has been limited to circumstances not present in this case.

Neither decision is dispositive here. Rejection of screening as a device to prevent exchange of information within a law firm between attorneys with conflicting interests is not necessarily a rejection of screening in all circumstances. On the other hand, *Board of Education* recognizes that its focus on Canon 4 and 5 considerations does not inevitably preclude disqualification for

violation of other standards.[3] Moreover, that decision was not at all concerned with the *extent* of a disqualification.

We have been well cautioned to proceed in these ethical matters with care, *United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955) (Kaufman, J.), mindful of the concerns of the parties, the profession, and the public, *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 575 (2d Cir. 1973). The formulation of standards concerning the future employment of government attorneys involves a careful weighing of competing concerns. See generally, Kaufman, *The Former Government Attorney and the Canons of Professional Responsibility,* 70 Harv.L.Rev. 657 (1957); Note, *Conflicts of Interest and the Former Government Attorney,* 65 Geo.L.J. 1025 (1977).

An overly strict approach to disqualification of the former government attorney and especially to disqualification of his firm impairs the client's choice of counsel and can impair the government's ability to attract non-career attorneys, if they come to believe that their post-government employment opportunities will be unduly restricted. These considerations themselves implicate ethical values concerning the availability of professional services.

On the other hand, the prohibition of DR 9–101(B) serves important values, which require appropriate enforcement. Chief among these, as this Court recognized in *General Motors Corp. v. City of New York, supra,* 501 F.2d at 648–49, is avoiding "the manifest possibility that . . . [a former Government lawyer's] action as a public legal officer might be influenced (or open to the charge that it had been influenced) by the hope of later being employed privately to uphold or upset what he had done" (quoting Formal Opinion 37 of the ABA Committee on Professional Ethics). Other concerns, not present in all cases, are

---

**3.** Judge Mansfield's concurring opinion in *Board of Education v. Nyquist,* 590 F.2d 1241 (2d Cir. 1979), recognized that a violation of DR 9–101(B) would be a proper occasion for disqualification, *id.* at 1247–48 n.1. In his view

participation by the former government attorney risked the use of confidential information unavailable to the other side, which would taint the trial.

that the former government lawyer might take a position adverse to the government agency, might disclose confidential government information, might make unfair use of undisclosed confidential information, might receive or appear to receive favored treatment from the agency, or might be or appear to be pursuing a governmental objective in private practice, free of restrictions imposed upon government personnel.

With these concerns in mind, we conclude that it would be entirely inappropriate to attempt to formulate a rule of general application respecting the law firm of a lawyer disqualified under DR 9–101(B) because of prior governmental activity. Variables along at least two dimensions might affect the result. First, is the "matter" for which the disqualified lawyer had "substantial responsibility" the kind of matter where the risks against which DR 9–101(B) guards are present? For example, in *Kesselhaut v. United States, supra,* the former government lawyer, as general counsel of the Federal Housing Authority, had some contact with a request for tax abatement that a New Jersey law firm was seeking to obtain for the FHA on an FHA property. The general counsel subsequently joined a Washington, D. C. firm that the New Jersey firm later retained to collect its legal fee for the successful handling of the tax abatement matter. In that context, the Court of Claims concluded, in accordance with Opinion 342, that screening of the former general counsel would be a sufficient safeguard to permit his firm to represent the New Jersey firm in its dispute with the government. While we express no opinion on that result, we note that the opportunity to handle a governmental matter so as to enhance the prospect of private employment was virtually non-existent in *Kesselhaut.* It is difficult to imagine anything the general counsel could have done (or been accused of doing) in overseeing the New Jersey firm's handling of the tax

abatement matter that might have enhanced his employment by a firm later retained to collect the New Jersey firm's fee. There was no claim that he played any role in the fee arrangement.

In the pending case, however, the conduct of governmental investigation and enforcement litigation is precisely the sort of activity where the risk of being influenced by the prospect of future employment is very real.

A second appropriate inquiry is whether the "substantial responsibility" that disqualifies the former government lawyer results from his active, personal participation in the matter or only from the nominal relationship of a supervisory official, such as an agency general counsel. In the latter case, knowledge of matters handled in his name is imputed to him, *United States v. Standard Oil Co., supra; Porter v. Huber,* 68 F.Supp. 132 (W.D.Wash.1946); see also ABA Formal Opinion 37, and this imputed knowledge suffices to disqualify him under DR 9–101(B). But whether it should disqualify his firm is an issue quite different from the issue in the pending case. The appearance of impropriety is substantial if a firm is permitted to prosecute or defend a matter with which an affiliated lawyer had direct, personal involvement as a government attorney.[4] But if his relationship to the matter was the formal one of a senior supervisor, the appearance of impropriety, though sufficient to disqualify him from handling the matter, would be greatly lessened for his firm by an appropriate screening procedure.

We leave for another day determination of whether screening procedures as contemplated by ABA Opinion 342 might be appropriate when the matter handled by the former government lawyer afforded no realistic opportunity for enhancing the prospect of private employment, or when the government lawyer had only a formal supervisory

---

4. The number of matters in which the government attorney has a direct, personal involvement, as distinguished from a formal, supervisory role, would seem to be sufficiently small so that disqualification of the firm would not significantly impair the government attorney's employment prospects nor impair the government's ability to recruit lawyers from private practice.

relationship to the matter. But in the case before us, we conclude that screening procedures, however faithfully observed, do not suffice to prevent disqualification of the firm. A government attorney with direct, personal involvement in a matter involving enforcement of laws that are the basis for private causes of action must understand, and it must appear to the public, that there will be no possibility of financial reward if he succumbs to the temptation to shape the government action in the hope of enhancing private employment.

ABA Opinion 342 expressed the view that screening of the disqualified lawyer, including barring his participation in any fees from the disqualifying case, would be effective in "destroying any incentive of the employee to handle his work so as to affect his future employment." 62 A.B.A.J. at 521. We disagree. In the first place, there is no effective way to prevent an upward adjustment of the disqualified attorney's salary, if he is an associate, or share of all other firm earnings, if he is a partner. Even if such adjustment were not overtly made to compensate for non-participation in the fees from the disqualifying case, it would be difficult to assure that such consideration did not play some subtle part in the complex of factors that determine associate bonuses or partnership shares. Moreover, the prospect of such circumvention would not be lost on the government lawyer tempted to misuse his authority. Finally, the appearance of impropriety is hardly diminished by an internal arrangement insulating fees from the disqualifying case, an arrangement that would most likely be unknown to casual observers and unpersuasive to the more informed.

 There is no suggestion that Altman committed any impropriety whatever in his handling of the Capital matter for the SEC, nor that his joining the Gordon firm or the Receiver's selection of that firm was actually motivated by any improper considerations. The enforcement of DR 9–101(B) and DR 5–105(D) to disqualify the Gordon firm in this case is required as a prophylactic measure to guard against misuse of authority by government lawyers.[5] In view of the type of matter Altman handled for the SEC and his direct, personal involvement with it, disqualification of his firm is required.[6] The ruling denying appellants' motion to disqualify is reversed,[7] and the cause remanded.

5. It would not be realistic to expect that subtle efforts by a government lawyer to shape investigations or lawsuits in the hope of later private reward could be adequately detected and punished after the fact.

6. Appellees suggest the motion to disqualify could have properly been denied on the ground of laches, since the motion was filed nearly two years after the suit was filed. As the District Court recognized, delay will not necessarily prevent disqualification in a proper case, Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 574 (2d Cir. 1973); United States v. Standard Oil Co., 136 F.Supp. 345, 351 n.6 (S.D.N.Y. 1955), although in view of the tactical nature of many disqualification motions, Board of Education v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. '979); J. P. Foley & Co. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J., concurring), undue delay might warrant denial, particularly in cases such as this where disqualification is considered primarily for its prophylactic effect on conduct beyond the lawsuit. However, there is no basis for invoking laches here, since the motion to disqualify was made at appellants' first court appearance after securing extensions of time to plead and only two months after the filing of the second amended complaint.

7. It is frequently observed that a trial court's disposition of a motion to disqualify counsel will be disturbed only for abuse of discretion, though this standard is more likely to be invoked when the ruling on the motion is affirmed, e. g., Lefrak v. Arabian American Oil Co., 527 F.2d 1136, 1140 (2d Cir. 1975); Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 567 (2d Cir. 1970), than when it is reversed, e. g. Board of Education v. Nyquist, 590 F.2d 1241 (2d Cir. 1979); International Electronics Corp. v. Flanzer, 527 F.2d 1288 (2d Cir. 1975). But some disqualification issues present legal questions that leave "little leeway for the exercise of discretion." American Roller Co. v. Budinger, 513 F.2d 982, 985 n.3 (3d Cir. 1975). Reversal occurs here because of our disagreement with the District Court that the principle of using screening procedures to enforce DR 9–101(B) is applicable to this type of case rather than any disagreement over the significance of particular facts.