Philip J. BROWN et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

Oliver T. Carr, Jr. and George Beuchert, Intervenors.

No. 13670.

District of Columbia Court of Appeals.

Argued May 31, 1979.

Decided March 31, 1980.

Nicholas A. Addams, Washington, D. C., for petitioners.

Richard W. Barton, Deputy Corp. Counsel, and Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., entered appearances on behalf of respondent and adopted the brief of intervenors.

Whayne S. Quin, Washington, D. C., with whom Norman M. Glasgow and Norman M. Glasgow, Jr., Washington, D. C., were on brief, for intervenors.

Before GALLAGHER, NEBEKER and FERREN, Associate Judges.

GALLAGHER, Associate Judge:

This petition from the Board of Zoning Adjustment (BZA) raises a problem which continues to provoke lively discussion among members of the legal community: regulation of the "revolving door" between government agencies and private law firms.[1]

Our inquiry focuses in this case upon former members of the District of Columbia Corporation Counsel's Office who, after leaving government tenure, allegedly repre-

---

1. The applicable ethics rule is ABA Code of Professional Responsibility DR 9–101(B). 18 U.S.C. § 207 (1976) (amended 1978) provided a criminal penalty for similar ethical violations by ex-District of Columbia Government employees where the "United States is a party or has a direct and substantial interest . . . ." *Id.* at § 207(a). The Ethics in Government Act of 1978, P.L. 95–521, 92 Stat. 1824, extended coverage of § 207 to include conflict of interest problems where "the United States *or the District of Columbia* is a party . . . ." 18 U.S.C. § 207 (Supp. II, 1978) (emphasis supplied). If the alleged impropriety here had taken place after the 1978 amendments went into effect, this controversy would have been covered by the federal statute in addition to the ABA Code of Professional Responsibility. However, the earlier version was in effect at the time of the BZA hearing in question here. 18 U.S.C. § 207 (1976) (amended 1978) was adopted in 1961, before the adoption of the District of Columbia Self Government and Governmental Reorganization Act, P.L. 93–198, 87 Stat. 774 (1973). It does not appear to apply to this zoning board proceeding, since the United States cannot be said to be a party or to have a significant interest in a zoning controversy with purely local implications.

sented parties whom they previously opposed before local agencies and courts. Petitioners contend that the resulting conflict of interest tainted the BZA proceeding here and requires reversal of the special exception granted to intervenor Carr.[2] The BZA refused to disqualify Mr. Carr's counsel, upon objection, stating it was without authority to do so. Since we find the Board's conclusion erroneous, the record will be remanded for investigation of the alleged impropriety, and for further proceedings consistent with this opinion.

## I.

Oliver T. Carr applied for a special exception under Zoning Regulation § 4502.32 to increase the number of off-street parking spaces at the Westbridge, a proposed residential and commercial complex in the new Commercial-Residential (CR) Zone in the West End section of the city.[3] At the public hearing on July 5, 1978, counsel for petitioners moved that the firm of Wilkes and Artis, applicant's counsel, be disqualified for a conflict of interest. As reason for objection, petitioners pointed out that two Wilkes and Artis attorneys, Mr. Francis Murphy and Mr. Iverson Mitchell, had formerly served as Corporation Counsel and Assistant Corporation Counsel, respectively, while negotiations between Carr and the zoning authorities had taken place with respect to the Westbridge. Mitchell's name appeared on the statement of applicant, and his signature appeared on a motion to reopen the record and conduct further hearings. Murphy did not appear to actively represent Carr in the special exception application, but was merely a partner in Wilkes and Artis.

The record does not establish the exact dates of Mitchell's or Murphy's tenure in the Corporation Counsel's Office or the extent of their contact with Carr while they were in government service. However, petitioners pointed to two previous encounters between the attorneys and Carr. One involved Carr's court challenge to 60-foot height restrictions on the Westbridge site and the other involved subsequent negotiations on the legality of the proposed Westbridge condominium, referred to in a letter from Carr's counsel to then Corporation Counsel Murphy.

Carr first became involved in promoting the CR district in 1973, through an organization called West End Planning, Inc. The proposed CR area was to include Carr's property, the old Sealtest Dairy site at 26th and Pennsylvania Avenue, N.W. Carr developed one plan for the new district, as did the Office of Planning and Management (OPM), and two citizen groups. A final proposal, which called for a 90-foot height throughout the district, was reviewed in a number of public hearings. The review process culminated in the Zoning Commission's adoption of a text and map amendment on December 23, 1974. The new zoning regulations included the parking restrictions at issue here. The text and map as adopted allowed a 90-foot building height in most of the CR zone, although height was restricted to 60 feet on all property within 220 feet of Rock Creek Park.

Carr challenged the 60-foot height restriction as it applied to his building site in Superior Court Civil Action No. 4122–75. Iverson Mitchell as Assistant Corporation Counsel defended the Zoning Commission's order restricting height. Plaintiff Carr won this case in mid-1975. Petitioners cite Mitchell's direct, personal involvement in CA 4122–75 as evidence of conflict of interest. Petitioners' counsel did not allege Mr. Murphy's personal participation in CA 4122–75, apparently relying simply on the

---

**2.** Petitioners challenge the special exception on other grounds which are unnecessary to consider at this time, in view of our disposition of the case.

**3.** As a matter of right, the building may include spaces for two-thirds of the dwelling units and must provide spaces for at least one-sixth of the dwelling units. Zoning Reg. § 4505.1. Applicant Carr sought an increase from 105 spaces to 157.

supervisory position of then Corporation Counsel Murphy during the litigation.

Somewhat later in 1975, Carr again had dealings with the Corporation Counsel's office with respect to his proposed Westbridge complex. These dealings are evidenced by a letter dated October 24, 1975, from Carr's counsel to Murphy as Corporation Counsel. The letter refers to an October 21 meeting where Carr's counsel sought the opinion of Mitchell and other Corporation Counsel lawyers about the legality of their air rights condominium. The letter contained a brief reference to the proposed building's conformance to the CR parking regulations. Petitioners' counsel relied on this letter as further evidence of a conflict of interest in either Mitchell or Murphy now representing Carr in the application for a parking special exception.

Mr. McCants, Chairman of the BZA, denied petitioners' request to disqualify the firm of Wilkes and Artis on the grounds that the BZA is not a proper forum to raise an alleged violation of the disciplinary rules of the American Bar Association, saying:

> I do not know if the Board has the authority or ability to even judge these things. Clearly the place to judge a conflict of interest or a violation of any of the disciplinary rules of the Bar Association or what have you would be with the Bar Association itself. I suspect, Mr. Addams, that if you had a question of that kind, the proper forum would be whatever disciplinary Board you might have in the Bar Association.

> It seems to me we are taking our jurisdiction a bit far when we try to interpose our interpretation of what the disciplinary rules of the Bar Association provide and whether this is in conflict with that or not. We have enough problem right now in trying to interpret these Regulations.

The chairman's conclusion is erroneous because the BZA has not only the authority but the responsibility to regulate practice before it.

## II.

■ It is true, as intervenors point out, that the authority to disqualify counsel for conflict of interest is not expressly granted to the BZA. The sole provision governing representation before the BZA appears in its Supplemental Rules of Practice and Procedure, 22 DCRR 1.5:

> In any proceeding before the Board an individual may appear on his own behalf or on behalf of any other person. An individual need not be a member of the bar of any court to appear in a representative capacity. Any individual appearing before the Board other than on his own behalf may be required by the Board to establish his authority to act in a representative capacity.

The Board rules further empower the presiding officer to "regulate the course of the hearing" and to "take any other action authorized by these rules or necessary under these rules." *Id.* 4.31, 4.38. Intervenors contend that the rule pertaining to appearance and representation is exclusive, and that the Board's interpretation of its own jurisdiction must stand. We conclude, however, that the Board's interpretation is clearly erroneous.

■ Implied in these broad rules is the BZA's power to adopt reasonable procedures to carry out its administrative tasks and protect the integrity of its proceedings. *See* 1 F. Cooper, State Administrative Law 176 (1965). In particular, the Supreme Court has stated that an administrative agency with authority to set its procedural rules may adopt standards to govern who may practice before it. *Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (authority exists regardless of the absence of an express statute providing for a list of enrolled attorneys). Many federal administrative agencies have adopted such standards. *See, e. g.*, 47 C.F.R. §§ 1.23–1.27 (FCC may censure, suspend, or disbar any person practicing before it who has failed to conform to the Code of Professional Re-

sponsibility or who has violated the federal "revolving door" statute, 18 U.S.C. § 207); 17 C.F.R. § 201.2 (SEC may suspend or disbar one who engaged in unethical or improper conduct). The Securities and Exchange Commission's rule was upheld in *Schwebel v. Orrick*, 153 F.Supp. 701 (D.D.C. 1957), *aff'd on other grounds*, 102 U.S.App. D.C. 210, 251 F.2d 919, *cert. denied*, 356 U.S. 927, 78 S.Ct. 716, 2 L.Ed.2d 759 (1958). As the United States District Court for the District of Columbia stated:

> the Securities and Exchange Commission has implied authority under its general statutory power to make rules and regulations necessary for the execution of its functions to establish qualifications for attorneys practicing before it and to take disciplinary action against attorneys found guilty of unethical or improper professional conduct, and . . . the Commission has adequately implemented this authority by its Rule . . . . [*Id.* at 704.]

This principle was reaffirmed in *Koden v. United States Department of Justice*, 564 F.2d 228 (7th Cir. 1977). The Court there examined 8 U.S.C. §§ 1103 and 1362 (1976),[4] code sections almost identical to 22 DCRR 1.5, 4.31 and 4.38, and found that these provisions gave the Immigration and Naturalization Service ample authority for its rule disbarring or disciplining attorneys for unprofessional conduct.

■ While the BZA clearly has the power to adopt a rule to deal with attorney conflict of interest, the fact remains that the BZA has not promulgated a rule specifically addressing the point. Even without such a rule, however, the BZA has the duty to entertain and adjudicate petitioners' motion. The Supreme Court addressed the matter of agency action in the absence of a promulgated rule in *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)

(*Chenery I*). The SEC had concluded that officers and directors of a holding company undergoing reorganization violated their fiduciary duty unless they exchanged their preferred stock under certain narrowly prescribed conditions. The SEC based this order on general equitable and legal precepts rather than on one of its own rules interpreting Securities legislation. The court in *Chenery I* invalidated the SEC's order. The SEC had based the order on principles which it judged to be well established fiduciary standards, generally recognized by courts. The Supreme Court held that the order could not stand on that basis alone since the cases upon which the Commission relied did not establish legal or equitable principles adequate to impose this particular fiduciary duty. *Id.* at 89–90, 63 S.Ct. at 460. This case can be distinguished from *Chenery I* because the legal and ethical precepts against conflict of interest are clear and generally recognized.

■ When the conduct of a zoning hearing is attacked and no ordinance or rule has been adopted to govern the Board's conduct, the courts rely on the principle that the hearing must be governed by well established rules of procedure generally applicable to agency adjudications. *See, e. g., Flick v. Gately*, 328 Ill.App. 81, 65 N.E.2d 137, 139 (1946); *Jarrell v. Board of Adjustment*, 258 N.C. 476, 128 S.E.2d 879, 883 (1963); Note, *The Rights of Parties Before Zoning Authorities*, 41 Miss.L.J. 271, 276 (1970); Note, *Board of Zoning Appeals Procedure: Informality Breeds Contempt*, 16 Syracuse L.Rev. 568 (1965). *See also Dietrich v. District of Columbia Board of Zoning Adjustment*, D.C.App., 293 A.2d 470, 474 (1972) (contested case hearing inadequate because of Board's failure to swear in witnesses). The applicable ethics rules here are clear and generally recognized and are embodied in the Code of Professional Re-

---

4. 8 U.S.C. § 1103 gives the Attorney General power to "establish such regulations . . . as he deems necessary for carrying out his authority . . . ." Section 1362 states that "[i]n any exclusion or deportation proceedings

. . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."

sponsibility. Similar rules are found in a federal criminal statute, 18 U.S.C. § 207 (1976) (amended 1978), and while this statute is not applicable here, see note 1 *supra*, it further demonstrates the wide acceptance of conflict of interest principles as applied to former government employees. Consequently, the BZA should have applied these well established conflict of interest precepts in deciding the motion before it.

The District of Columbia Administrative Procedure Act specifically directs that "[t]he procedures required to be established by . . . this section *shall* include requirements of practice before . . . each agency." D.C.Code 1973, § 1–1503(c) (Supp. VI, 1979) (emphasis supplied). The parties before the Board are entitled to a fair hearing free of conflicts of interest. *See generally* 3 Rathkopf, The Law of Zoning and Planning, § 37.07 (4th ed. 1979); 7 Ruhan, Zoning and Land Use Controls, § 51.06 at 51–74 (1979). *See also* Sullivan, *Araby Revisited: The Evolving Concept of Procedural Due Process Before Land Use Regulatory Bodies*, 15 Santa Clara Law. 50, 63 (1974) (courts often refuse to uphold a decision if the local zoning authority has committed gross procedural error); Comment, *Judicial Control over Zoning Boards of Appeal: Suggestions for Reform*, 12 UCLA L.Rev. 937, 953 (1965) (if courts or agencies do not adopt procedural rules, courts should impose them); *see also Fasano v. Board of County Commissioners*, 264 Or. 574, 507 P.2d 23 (1973) (all land use regulatory proceedings must not only be fair, but must also appear fair to all parties involved); *Fleming v. City of Tacoma*, 81 Wash.2d 292, 502 P.2d 327 (1972) (same); *Smith v. Skagit County*, 75 Wash.2d 715, 733, 453 P.2d 832, 842 (1969) (same). This principle has been applied in a case where the integrity of a District of Columbia Board of Zoning Adjustment proceeding was questioned. In *Jarrott v. Scrivener*, 225 F.Supp. 827 (D.D.C.1964), the District Court voided a variance granted to the USSR embassy because highly placed United States officials, off the record, had urged several board members to approve the variance, with the result that the proceedings were tainted. *See also Wilson v. District of Columbia Board of Zoning Adjustment*, D.C.App., 289 A.2d 380, 383–84 (1964).

■ The danger of retroactivity in this case is not present, since intervenors' attorneys should be held to have been aware of the existing conflict of interest rules and the principles underlying them. They could not now claim injustice merely because existing rules will be applied in a particular forum they may not have anticipated. The policies underlying the conflict of interest rules can only be implemented effectively by an agency screening process. *See generally* Perkins, *The New Federal Conflict-of-Interest Law*, 76 Harv.L.Rev. 1113, 1166 (1963) (agency heads must take initiative to establish "vigorous and effective machinery for dealing with conflict-of-interest problems"); Elliott, letter to the editor, 66 Geo. L.J. 195 (1977) (agency best able to decide if a violation has occurred).

■ We are not suggesting that the BZA proceed to decide all future cases involving conflict of interest on an *ad hoc* basis. Uncertainty and confusion might attend such a course of action. *See, e. g., Ehrenberg v. Persons*, 8 App.Div.2d 18, 185 N.Y.S.2d 369, 372 (1959) (when Board of Zoning Adjustment is ordered by statute to fix a general rule governing time for appeals, but fails to fix the rule, Board may not decide as each case comes before it, on the basis of reasonableness, whether the appeal has been timely). *But see Cave v. Zoning Board of Appeals*, 49 App.Div.2d 228, 373 N.Y.S.2d 932 (1975) (when board failed to adopt rule governing time for bringing an appeal, court, not board, has power to decide whether time which actually elapsed was reasonable). Rather, we assume the Board will in the future adopt through rulemaking a clear and precise standard which will guide ex-government attorneys who may wish to

represent clients before the BZA.[5] *See, e. g., Keating v. Zoning Board of Appeals*, 325 A.2d 521 (Me.1974) (in the absence of a rule setting time to appeal, zoning board cannot make *ad hoc* determinations of what is a "reasonable" time, because of need for certainty and uniformity).

The agency must decide the motion before it to protect the integrity of its own hearings, and to implement the public policy of deterring conflict of interest. Consequently, we remand the record to the Board of Zoning Adjustment for a determination of whether intervenors' counsel should be disqualified because of previous responsibility for the same matter while employed by the District of Columbia.

### III.

Since the issue is apparently not a familiar one for the Board, we will offer some guidance in this instance.

The question before the BZA on remand is whether intervenors' counsel violated the American Bar Association's Disciplinary Rule 9–101(B), which states that in order to avoid even the appearance of impropriety, "[a] lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." The BZA first must decide whether either the height litigation in CA 4122–75 or the discussion of parking referred to in the October 1975 letter involved the same "matter" as the parking special exception at issue here. If so, the next question is whether either Mitchell or Murphy had substantial responsibility for either of the previous matters. If Mitchell or Murphy were to be found to violate the ethics laws by representing Carr here, the Board must then decide whether the disqualification extends to the Wilkes and Artis firm as a whole, or whether instead the Corporation Counsel provided a satisfactory waiver and Mitchell and/or Murphy were

effectively screened so as not to disqualify the entire firm. ABA Formal Opinion No. 342 (1975).

■ The policy behind the disciplinary rule is to avoid even the appearance of impropriety. Such impropriety could take several forms. An attorney may not take actions while in government service, and then "change sides" and challenge the validity of those same actions. *See* ABA Formal Opinion No. 71 (1932) (after city attorney helps prepare and validate a bond issue, improper to represent taxpayers urging invalidity of bonds); *Traylor v. City of Amarillo*, 335 F.Supp. 423 (N.D.Tex.1971) (former city attorney disqualified from attacking constitutionality of an ordinance he had earlier defended); *United States v. Standard Oil Co.*, 136 F.Supp. 345, 359 (S.D.N.Y. 1955) (government attorney who passed on validity of a rule may not later litigate the rule's validity in a different factual dispute before the agency). Appearance of impropriety can arise as well from accepting private employment to uphold prior official actions. The concern behind the ethics rule and the similar federal statute, 18 U.S.C. § 207, is that the government employee not be influenced in the performance of public duties by the thought of later reaping a benefit from a private individual. *See Armstrong v. McAlpin*, 606 F.2d 28 (2d Cir. 1979) *petition for rehearing en banc granted*, No. 79–7042 (2d Cir., Dec. 12, 1979) (prohibition of 9–101(B) serves important values such as avoiding the possibility that a former government lawyer's action might be influenced, or open to that charge, by hope of later being employed privately to uphold or upset what he had done); *Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir. 1976) (statute designed to avoid possibility that official action might be influenced by employee's hope of later being employed privately to uphold or upset what he had done); McElwain and Vorenberg, *The Federal Conflict of Interest Statutes*,

---

5. This court presently has pending before it for consideration proposed rules on conflict of interest. Any such rules which may be adopted would relate to all members of the local bar.

65 Harv.L.Rev. 955, 958 (1952) (intention to deter performance of public duties in self-serving way). This issue has been raised by petitioner, who charges that Attorney Mitchell, while serving as Assistant Corporation Counsel, failed to defend diligently the Zoning Commissioner's December 23, 1974 order limiting building height to 60 feet on Carr's property.

If the BZA finds no such actual conflict of interest it still must consider even the *appearance* of wrongdoing presented by the possible use of insider information on the particular matter in controversy. Thus, a serious question before the BZA, in analyzing whether the former zoning litigation or negotiations involving Carr are the same "matter" as the parking exception, as charged by petitioners, is whether a government attorney participating in the former has carried away specific information not otherwise available that will be helpful in pursuing the latter. *See Allied Realty of St. Paul, Inc. v. Exchange National Bank,* 408 F.2d 1099, 1102 (8th Cir. 1969) (canon intended to prohibit financial advantage from use of information obtained as public official).

■■■ In oral argument, intervenors' counsel contended that the former litigation on height was rulemaking, involving change in a zoning regulation of general applicability and, thus, could not give rise to information relevant to this adjudication of the five special exception criteria set forth in Zoning Regulation § 4502.32. It seems clear, however, in determining whether a former zoning proceeding is the same "matter" as a later zoning proceeding, that a formal distinction between rulemaking and adjudication should not automatically rule out the possibility that the two proceedings concern the same "matter" when both proceedings determine rights in the same property. The critical test must be whether the government attorney in the former zoning proceeding had the *opportunity to gather* information he could not otherwise have gained which he could then use on behalf of

the private party in the later proceeding. The information of concern is not general data on neighborhood conditions, traffic, or public goals of the kind which should be in the public record. Rather, the BZA should determine if Mitchell or Murphy had access to specific information not available to the public.

In oral argument, intervenors' counsel also claimed that the October 1975 letter referred only to the air rights condominium and not to the matter of a parking variance here before the Board. While the letter dealt primarily with air rights, it contained a brief reference suggesting that parking was discussed by Corporation Counsel attorneys and Carr's attorneys. Those discussions should be part of the BZA's inquiry. To assess petitioners' charges, the BZA must decide whether Carr's initial intentions regarding the amount of parking in the Westbridge is relevant under the "necessity" facet of the special exception test under Zoning Regulation § 4502.32(c). If so, the BZA must determine whether Mitchell or Murphy had previous knowledge of Carr's intention and whether that is the type of information which casts an aura of impropriety on their present representation of Carr. The BZA should bear in mind that concern about improper use of information acquired by a public employee has generally evolved in areas of government investigation and enforcement where the information was acquired under color of official power. *See e. g., Armstrong v. McAlpine, supra; Woods v. Covington County Bank, supra* at 816; ABA Formal Opinion No. 135 (1935). There being no record in this case we are expressing no view as to whether there has been an impropriety nor as to whether it is the same "matter."

Should the BZA determine that this parking special exception is the same "matter" as something previously handled by Corporation Counsel, then it must decide if Mitchell or Murphy had "substantial responsibility" for the prior matter in his government tenure. Perfunctory involvement or official supervisory responsibility for the prior matter without real knowledge or participa-

tion may not be enough to lead to later disqualification. *See United States v. Standard Oil Co., supra* at 359 (knowledge should be imputed to a supervisory attorney only if he made actual use of relevant materials or where the specific duties of his job would have required him to do so); Kaufman, *The Former Government Attorney,* 70 Harv.L.Rev. 657 (1957) (commenting on his decision in *U. S. v. Standard Oil Co., supra* ).

If the BZA should find that either attorney is disqualified, it will also have to decide whether other members of the Wilkes and Artis law firm are consequently disqualified. ABA Disciplinary Rule 5–105(D)[6] extends the disqualification of one lawyer in a firm to all affiliated lawyers. It is assumed under 5–105(D) that if one partner is disqualified all members of the partnership are barred from participation in this case. *See Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures, Inc.,* 224 F.2d 824, 826 (2d Cir. 1955). However, in Formal Opinion No. 342 (1975), the American Bar Association reasoned that DR 5–105(D) does not require the automatic disqualification of the entire law firm when one attorney is disqualified under DR 9–101(B). Rather, the government may waive the protection of DR 9–101(B) if it determines that the law firm employed screening measures to isolate the individual lawyer from participating in the latter matter and sharing the fees. Thus, intervenors contend that even if the BZA does find that Mitchell or Murphy, while in the Corporation Counsel's Office, substantially participated in the same "matter," their disqualification does not extend to the Wilkes and Artis law firm as a whole, because the Corporation Counsel waived any protection to which the D.C. Government was entitled under DR 9–101(B) and Mitchell and Murphy were screened from contact with the Wilkes and Artis attorneys who applied for Carr's parking exception.

The BZA's analysis of whether 342 was followed will differ with respect to Mitchell and Murphy. The BZA should evaluate the law firm's contention that screening was employed in light of the fact that Mitchell's name appeared on some of the pleadings. Mitchell signed Carr's motion to reopen the record and conduct further hearings. His name without signature appeared on the application. The Board will doubtless consider whether an attorney who signs such documents could be completely removed from the conduct of the case, or whether he did not communicate with his colleagues who shared responsibility for the case. *Cf.* Fed.R.Civ.P. 11 ("the signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it . . . ."); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 232 (2d Cir. 1977) (participation in a suit established by (1) sorting out documents relating to the defendant, (2) inquiring about status of investigation, (3) giving legal opinions, (4) choosing attorney who would actually bring suit, (5) attending meetings in which the suit was discussed, and (6) reviewing the complaint). Since Murphy did not sign any of the documents in the case, the Board's analysis of whether Murphy was screened will differ from its analysis as to Mitchell.

### IV.

Summing it up, the BZA has the inherent authority and the duty to protect the integrity of its proceedings by entertaining a motion to disqualify an attorney who was alleged to have violated the revolving door rule. We have offered some guidelines to assist the Board in interpreting ABA Disciplinary Rule 9–101(B) since this is a novel area for the Board. The initial determination will be to ascertain whether the previous contacts between petitioner and the Corporation Counsel constituted the same "matter" when petitioner sought a series of zoning actions in order to construct a single building. If the Board concludes in the affirmative, it must decide whether either ex-government attorney "substantially participated" in that matter during his govern-

---

**6.** DR 5–105(D) provides "[i]f a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate . . . may accept or continue such employment."

ment service. Finally, if the BZA should find an ethical violation in either attorney's representation of the petitioner, it must decide whether the disqualification should extend to the entire law firm, by virtue of the failure of the Corporation Counsel to waive DR 9–101(B) protection and/or the failure of the firm to provide a suitable screening mechanism. In deciding each of these questions, the Board must consider the policies behind the ethics rules. These are, essentially, to preclude the possibility of enhancing later private employment or misusing information acquired under color of government authority so as to avoid even the appearance of impropriety.

If after a hearing the Board concludes there was no conflict of interest present, the Board shall certify the record on remand to this court and we will proceed to decide the case on the merits. If, on the other hand, the Board concludes there was a conflict of interest present then, as a matter of law, the proceeding was tainted and the Board would be required to vacate its decision and conduct a new hearing.

*Remanded for further proceedings in accordance with this opinion.*