COMMITTEE FOR WASHINGTON'S
RIVERFRONT PARKS, et al.,
Petitioners,

v.

Carol B. THOMPSON, Mayor's Agent for
D.C. Law 2–144 District of Columbia De-
partment of Housing and Community
Development, Respondent.

Georgetown Harbour Associates,
Intervenor.

No. 81–1304.

District of Columbia Court of Appeals.

Argued April 28, 1982.

Decided Oct. 1, 1982.

Douglas A. Dworkin, Washington, D.C., with whom Irvin B. Nathan and David Bonderman, Washington, D.C., were on the briefs, for petitioners.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Whayne S. Quin, Washington, D.C., with whom C. Francis Murphy and Christopher H. Collins, Washington, D.C., were on the brief, for intervenor.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

MACK, Associate Judge:

Petitioners seek review of an order of the Mayor's Agent which authorized construction of a "mixed use development"[1] on the Georgetown waterfront. They challenge the Agent's findings and conclusions and contend that alleged procedural defects and conflicts of interest require reversal of this order. We find petitioners' arguments without merit and affirm the order of the Mayor's Agent.

I.

The instant petition questions the validity of proceedings in which intervenor, Georgetown Harbour Associates, sought and obtained approval to construct the mixed use development on the Georgetown waterfront at 3020 K Street, N.W. We briefly review the chronology of intervenor's attempts to develop this site and the procedural history of this litigation before addressing the merits of petitioners' claims.

In 1974 the District of Columbia Zoning Commission promulgated rules which amended zoning regulations then in effect and created new mixed-use waterfront zone districts. The Commission subsequently rezoned the Georgetown waterfront, where only commercial development had previously been allowed, to permit less dense commercial uses and mixed residential and commercial development south of M Street, N.W.

This rezoning paved the way for the extensive development which has taken place in this area in recent years and sparked controversy over the fate of the property which abuts the Potomac River. The District of Columbia owns approximately two-thirds of this land; intervenor, a private developer, controls the remaining third. Debate centered on whether the land should be used to create a national park—an alternative favored, *inter alia,* by the Commission of Fine Arts and various civic organizations—or developed, at least in part, with commercial and residential structures of the type allowed under the amended zoning regulations.

In 1978 Senator Charles Mathias organized a Georgetown Waterfront Task Force to discuss this issue. The task force included representatives from the Commission of Fine Arts, the National Capital Planning Commission, the Department of the Interior, the District of Columbia government, civic groups, and intervenor. Task force members ultimately approved a proposal which called for a combination of parkland, commercial and residential development on the waterfront; the agreement also included guidelines describing the type of mixed use development envisioned by the task force.

Intervenor's property lies within the Old Georgetown Historic District as designated by the Old Georgetown Act, D.C.Code 1981, § 5–1101. Consequently, in seeking to develop its property, intervenor was required to comply with procedures prescribed by the Old Georgetown Act, *id.* § 5–1101 *et seq.* [formerly D.C.Code 1973, § 5–801 *et seq.*], and the Historic Landmark and Historic District Protection Act of 1978, *id.* § 5–1001 *et seq.* [formerly D.C.Code 1980 Supp., § 5–821 *et seq.*]. These statutes require that design proposals for new construction in the Old Georgetown Historic District be submitted to the Commission of Fine Arts for review. *Id.* §§ 5–1007(b), –1102. The Mayor must consider the Commission's recommendations in evaluating permit applications, *id.,* and must hold a public hearing upon the request of an applicant. *Id.*

---

1. The development authorized here allocates space for office, retail and residential purposes with a boat basin as a centerpiece, pedestrian walkways, and a river's edge promenade. The facades of structures which surround the boat basin vary in color from red to brown brick and incorporate architectural elements such as bays, turrets, arches, elliptical and segmented windows, and modulated balconies.

§ 5–1007(e). The Old Georgetown Act authorizes the Mayor to "take such actions as in his judgment are right and proper in the circumstances" after considering the Commission's recommendation. *Id.* § 5–1102. The Historic Protection Act requires the Mayor to issue a construction permit unless he "finds that the design of the building and the character of the historic district ... are incompatible ...." *Id.* § 5–1007(f). By executive order, the Mayor has designated respondent his agent for purposes of these Acts.

In 1979, pursuant to these statutes, intervenor submitted a design, for a mixed use development based on the guidelines outlined in the Georgetown Waterfront Task Force Agreement, to the Commission of Fine Arts. The Commission rejected this design.

Following this rejection, intervenor retained another architect who designed an entirely different proposal for a mixed use development. This design, which differs substantially in concept and appearance from the first proposal, became the subject of the proceedings we now review on appeal.

Intervenor submitted this second design to the Commission of Fine Arts, which initially rejected it on March 10, 1981. After reconsideration, the Commission again rejected the proposal at a meeting on April 7, 1981, reiterating its preference that the entire Georgetown waterfront be devoted to recreational use. Absent a binding commitment from the District of Columbia to transfer the waterfront property it owns adjacent to the development site to the National Park Service, the Commission stated that it was unwilling to approve development on this site.

After receiving the design proposal, the Mayor's Agent conducted public hearings on the permit application from June 29 through July 8, 1981 at intervenor's request. At the outset of the proceedings petitioners (various citizens' and civic groups) moved that the law firm of Wilkes & Artis, intervenor's counsel, as well as two consultants retained by intervenor, be disqualified from further participation on conflict of interest grounds. The Mayor's Agent denied this motion and allowed the firm to continue its representation of intervenor in this matter.

On August 7, 1981, following the close of the record in these proceedings, the Mayor's Agent visited the proposed construction site in the company of other District of Columbia employees. The parties and their counsel did . not participate in this visit. On September 11, 1981 the Mayor's Agent approved intervenor's construction permit application based on her conclusion that the design and character of the development and the historic district were not incompatible.

However, on September 25, 1981 the Mayor's Agent sua sponte vacated the order which approved the permit application and announced that she would revisit the site in the company of the parties and their counsel and conduct a hearing to allow them an opportunity to address the materiality of views obtained through her visits. Hence, on October 5, 1981 respondent retraced the path of her previous visit accompanied by the parties and their counsel and conducted a hearing. At the hearing the Mayor's Agent identified the material facts revealed by her visits and allowed the parties to address two issues: whether the proposed development would overshadow the historic district and whether it would obstruct the view of the Potomac River from the area north of the construction site.

By order of October 20, 1981 the Mayor's Agent approved intervenor's application for a construction permit. Shortly thereafter petitioners sought unsuccessfully to reopen the proceedings based on a newspaper article which reported that the District of Columbia planned to lease some of its waterfront property for private commercial use.

This court denied petitioners' motion to stay the October 20 order. We now consider the merits of their challenges to this order.

## II.

Petitioners' initial challenges to various aspects of the proceedings before the May-

or's Agent may be characterized collectively as administrative due process claims. Specifically, petitioners challenge the propriety of respondent's site visits, the adequacy of the notice of the October 5, 1981 site visit and hearing, evidentiary rulings which curtailed their cross-examination of intervenor's witnesses, and the denial of their motion to reopen the proceedings. These claims are without merit.

*The site visit; party presence and notice.*

A. Where, as here, a site visit is conducted to obtain information material to issues raised in an adjudicatory proceeding, the agency should conduct the visit on the record in the presence of the parties. *Northeast Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 302 A.2d 222, 224–25 (1973); *Citizens Association of Georgetown, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 288 A.2d 666, 670–71 & n. 7 (1972) (*Georgetown I*). Where an off-the-record site visit is conducted by an agency in the absence of the parties, however, a subsequent hearing may cure the defect. At such a hearing the agency "should set forth the facts it considers to have been revealed as a result of the inspection. It should then give the [parties] the opportunity to address themselves to these facts by evidence or argument." *Id.* at 670–71 (footnote omitted); *accord, Northeast Liquors, Inc., supra.*

■ We conclude, therefore, that while the initial visit by the Mayor's Agent to the site of the proposed development was improper, the second visit and subsequent hearing cured this defect. The Mayor's Agent clearly followed the curative procedures prescribed by the law of this jurisdiction by revisiting the site with the parties and conducting a hearing at which she first identified the material facts disclosed by her visits and then allowed the parties to address them. *Compare Northeast Liquors, Inc., supra* (although agency conducted hearing following improper site visit it erred in failing to specify the material facts revealed by the improper visit and did not afford the parties an opportunity to address these facts).[2]

B. We likewise reject petitioners' contention that notice of the October 5, 1981 site visit and hearing was untimely and insufficiently identified the issues that would be addressed at the hearing.

■ The Mayor's Agent provided the parties with ten days' written notice of the October 5 proceedings. Petitioners contend that the provisions of D.C.Code 1981, § 1–261(b) [formerly D.C.Code 1978 Supp., § 1–171i(b) ] and § 3.2 of the Rules of Procedure promulgated pursuant to the Historic Protection Act required thirty days' notice. Respondent argues that only the "reasonable notice" requirement of the DCAPA, *see* D.C.Code 1981, § 1–1509(a), applied to the reopened proceedings because the statute and regulation govern only the initiation of a body of proceedings, not stages in proceedings for which the thirty-day notice has been initially given.

■ D.C.Code 1981, § 1–261(b) & (c)(1) requires that thirty days' notice of action by the District of Columbia government with respect to permit applications be given to affected Advisory Neighborhood Commissions (ANCs). The DCAPA, on the other hand, requires only that parties in contested cases "be given reasonable notice of the afforded hearing ...." *Id.* § 1–1509(a). We have emphasized the importance of the notice requirements of the ANC Act as a means of ensuring that Advisory Neighborhood Commissions are able to perform their statutory functions. *Kopff v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 381 A.2d 1372 (1977)

2. Petitioners argue that the Mayor's Agent should have been required to testify under oath concerning the facts and motives of her first visit. They also argue that she should have disqualified herself from participation in the second visit and hearing because it was improper for her to assess the materiality and propriety of the August 7 visit. We find no merit in these contentions. The October 5 hearing was not an inquiry into the propriety of the earlier site visit but, rather, an opportunity for the parties to address issues raised by the site visits. *See Northeast Liquors, Inc., supra; Georgetown I, supra.*

(*Kopff I*). To this end we have held that the notice requirements of the ANC Act must be satisfied in addition to any other notice requirements imposed by statute or regulation with respect to a hearing. *Id.* at 1381. However, actual notice to the affected ANC which allows meaningful participation in a proceeding is sufficient to cure merely technical violations of the thirty-day notice requirement of the ANC Act. *Shiflett v. District of Columbia Board of Appeals and Review,* D.C.App., 431 A.2d 9 (1981); *Kopff I, supra.*

■ Assuming the standing of petitioners here to rely upon the notice requirement of the ANC Act,[3] we find respondent's interpretations of that requirement persuasive. D.C.Code 1981, § 1–261(c)(1) provides in relevant part that "each agency . . . shall . . . before the formulation of any final policy decision . . . with respect to . . . permits affecting said commission area . . . provide to each affected commission [thirty days'] notice of the proposed action . . . ." We construe this language to require thirty days' notice of the *body* of proceedings arising from each permit application, not each *stage* of such proceedings. This construction is consistent with the plain meaning of this statutory language and the purposes of the Advisory Neighborhood Commission legislation. Accordingly, respondent was bound solely by the "reasonable notice" requirement of D.C.Code 1981, § 1–1509(a), as the October 5, 1981 hearing was merely a stage in permit application proceedings about which the affected ANCs had already been properly informed. *Compare Kopff v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 413 A.2d 152 (1980) (*Kopff II*) (agency hearing conducted pursuant to remand for *new* hearing by appellate court was *not* a continuation of the initial proceeding and therefore triggered notice requirements applicable to new hearings, including thirty-day notice to affected ANCs).

■ Likewise, if we were to further assume, arguendo, that the ANC Act required

thirty days' notice of the instant hearing, violation of this requirement would not require reversal. The record reflects that the affected ANC presented its views at the initial hearings and was represented by counsel at the October 5, 1981 hearing. Petitioners have failed to specify the manner in which the ANC was prejudiced by the allegedly deficient notice. The argument here is reduced to a mere allegation of a technical violation of D.C.Code 1981, § 1–261(b). *See Shiflett, supra; Kopff I, supra.*

■ Similarly, we find no merit in petitioners' argument that the Rules of Procedure[4] promulgated pursuant to the Historic Protection Act required thirty days' notice of the October 5 hearing. Section 3.2(b)(1) of these Rules provides that "[n]otice of the public hearing shall be given by the Mayor not less than thirty days before the date of the hearing . . . to . . . the Advisory Neighborhood Commission for the area in which the property is located." 26 D.C.Reg. 282 (1979). The Mayor's Agent construed this regulation to require thirty days' notice of the entire body of proceedings arising from each permit application and hence found it inapplicable to a hearing which merely constitutes a stage in such proceedings. We find this interpretation reasonable, particularly in light of our construction of the thirty-day notice requirement of D.C.Code 1981, § 1–261(b), and therefore conclude that notice of the October 5 hearing was timely under this regulation. *See, e.g., Goto v. District of Columbia Board of Zoning Adjustment,* D.C.App., 423 A.2d 917, 924 (1980) (appellate court must accept agency's interpretation of its own regulation unless the agency's construction is clearly erroneous).

Finally, we find that the Mayor's Agent adequately identified the issues that would be addressed at the October 5 hearing. The DCAPA requires that notice of a hearing in a contested case identify the matters at issue but provides that "if, by reason of the nature of the proceeding . . . the agency

---

**3.** The ANC is not a party before this court.

**4.** *See* 26 D.C.Reg. 263 *et seq.* (1979).

determine[s] that the issues cannot be fully stated in advance of the hearing ... they shall be fully stated as soon as practicable ...." D.C.Code 1981, § 1–1509(a). In the instant case, the September 25 order stated that the purpose of the hearing was to allow the parties to address the materiality and relevance of views adopted by the Mayor's Agent on her visits to the site of intervenor's proposed development. At the hearing which followed the second visit, she clarified the scope of the proceeding by announcing that the parties were to address two specific issues. The Mayor's Agent thus complied with notice requirements by announcing the general scope of the October 5 hearing in advance and then clarifying the issues as soon as practicable, *i.e.*, after the second site visit.[5]

*The conduct of the proceedings; admission and use of evidence.*

Petitioners argue that the Mayor's Agent improperly limited cross-examination of intervenor's witnesses by restricting inquiry into their compensation arrangements and by sustaining intervenor's objection to use of a particular photographic slide in questioning an expert witness.

 It is well established that rules of evidence which normally govern trials are subject to more flexible application in the context of administrative proceedings. Generally, "greater flexibility and discretion as to admission [of evidence] are permitted." *Kopff I, supra* at 1385 (citing 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 14.-01 *et seq.* (1st ed. 1958)). While failure to apply the rules of evidence flexibly in favor of the admission of evidence can constitute error, reversal is appropriate only upon a showing of prejudice. *Id.* We therefore first examine the challenged rulings to determine whether the Mayor's Agent erred in excluding evidence and then consider whether petitioners have demonstrated prejudice.

A. Petitioners cross-examined two of intervenor's experts concerning their financial interest in the outcome of the permit application proceedings in order to establish their bias. They were allowed to establish that one witness received compensation for his architectural design, but the Mayor's Agent refused to allow inquiry into the specifics of his compensation arrangement. Petitioners did not ask the second expert *whether* he received compensation for his services; instead, they questioned him about his specific fee arrangements.

 Questions concerning witness compensation are proper to establish bias, *see* 3A WIGMORE, EVIDENCE § 961 (Chadbourn rev. 1970); however, a court may in its discretion prohibit inquiry into the specifics of compensation agreements. *See, e.g., Olson v. Ela*, 8 Mass.App. 165, 392 N.E.2d 1057 (1979); *Podbielski v. Argyle Bowl, Inc.*, 44 Mich.App. 280, 205 N.W.2d 240 (1973), *aff'd*, 392 Mich. 380, 220 N.W.2d 397 (1974). Moreover, "agency members are presumed capable of properly assessing the reliability and weight of evidence ...." *Kopff I, supra* at 1385 (citation omitted). In the instant case, petitioners were allowed to show one of the witnesses' bias by asking whether he received compensation from intervenor, whether compensation was based on a contingent fee arrangement, and whether he had a financial interest in the project apart from the fee he received for his architectural design. They were not denied an opportunity to establish the *fact* that the second witness received compensation; the Mayor's Agent merely restricted inquiry into the specifics of his fee arrangement. Limitation of petitioners' cross-examination to these questions was not an abuse of discretion. *See Olson, supra; Podbielski, supra.*

B. Petitioners also attempted to cross-examine intervenor's architect concerning certain features of his design using their own photographic slide of the development

---

5. At the October 5 hearing the Mayor's Agent incorrectly stated that the September 25 order had specifically identified the two issues that were eventually addressed at that hearing. Although her statement was inaccurate it did not vitiate the adequacy of the notice actually given.

model. Relying on the well-established principle that the scope of cross-examination is limited to matters covered on direct examination, the Mayor's Agent sustained intervenor's objection to petitioners' use of this slide on the ground that the exhibit had not been used during the direct examination of this witness and was therefore an improper subject for cross-examination.

 The Mayor's Agent erred in requiring that petitioners use intervenor's exhibits to cross-examine this witness. Petitioners attempted to use their exhibit to question the witness concerning certain physical characteristics of the architectural design, a matter which was clearly within the scope of the direct examination. For this purpose they were entitled to use any exhibit which fairly represented the proposed development, and should therefore have been allowed to establish that their slide fairly represented the architectural model and then to cross-examine the witness with this exhibit. *See* McCormick, Handbook of the Law of Evidence § 213 (2d ed. 1972). However, we find the error harmless on this record. Petitioners have failed to establish prejudice and we find none.

*The denial of the motion to reopen the proceedings.*

Petitioners contend that the Mayor's Agent erred in refusing to reopen the permit application proceedings in response to a motion based on an October 21, 1981 newspaper article.

At the hearings a District of Columbia government representative testified that efforts were underway to transfer the District's Georgetown waterfront property, which adjoins the site of intervenor's development, to the National Park Service with the intent that the site be used as a park. In her order of October 20, 1981, however, the Mayor's Agent found that "preferences for and efforts to provide a park" on the

Georgetown waterfront were irrelevant to the issue before her, *viz.*, the compatibility of the proposed project and the historic district. The newspaper article, published after issuance of the order, reported that the District of Columbia planned to lease a portion of its waterfront property for private commercial use.

 The decision whether to reopen the proceedings was vested in the sound discretion of the Mayor's Agent.

"Administrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated.... If upon the coming down of the order litigants might demand rehearing, as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body." [*United States v. Interstate Commerce Commission*, 396 U.S. 491, 521, 90 S.Ct. 708, 722, 24 L.Ed.2d 700 (1970) (quoting *Interstate Commerce Commission v. Jersey City*, 322 U.S. 503, 514–15, 64 S.Ct. 1129, 1134–1135, 88 L.Ed. 1420 (1944)).]

*See Northeast Broadcasting, Inc. v. FCC*, 130 U.S.App.D.C. 278, 287, 400 F.2d 749, 758 (1968) (decision whether to conduct rehearing is addressed to sound discretion of administrative agency). Given her conclusion that plans to create a park on the Georgetown waterfront were irrelevant to the evaluation of intervenor's design proposal, the Mayor's Agent did not abuse her discretion in denying petitioners' request.[6]

---

**6.** Petitioners also contend that the Mayor's Agent failed to comply with the requirements of the Old Georgetown Act, D.C.Code 1981, § 5–1101 *et seq.*, apparently since she referred

only to the Historic Landmark and Historic District Protection Act, *id.* § 5–1001 *et seq.*, in the order approving intervenor's construction permit application. This argument is without

### III.

Petitioners' second line of attack argues that the Mayor's order is unlawful because of unethical conduct by some of the participants. At the outset of the hearings before the Mayor's Agent petitioners moved to disqualify the law firm of Wilkes & Artis, intervenor's counsel, and two consultants who assisted in preparing for these hearings from further participation in the proceedings on conflict of interest grounds. Petitioners contended that, because a member of the law firm and the two consultants were involved in the subject matter of the instant proceedings while they were government employees, their participation in these hearings presented conflict of interest problems. The Mayor's Agent denied this motion on the ground that the matters the three individuals were responsible for as government employees were distinct from those at issue in the proceeding before her. We affirm this decision, concluding that petitioners did not establish that conflicts of interest were present.

### The Law

Before discussing the evidence, we turn briefly to the authority relied upon as prohibiting the challenged conduct and the sanctions flowing from any violation thereof.

The Ethics in Government Act of 1978, 18 U.S.C. § 207 (Supp. IV 1980) and Disciplinary Rule 9–101(B) of the American Bar Association Code of Professional Responsi-

bility[7] govern the determination of whether conflicts of interest were present under the circumstances of this case. In *Brown v. District of Columbia Board of Zoning Adjustment,* D.C.App., 413 A.2d 1276, 1282 (1980) this court noted that "[t]he concern behind the ethics rule [DR 9–101(B)] and the similar federal statute, 18 U.S.C. § 207, is that the government employee not be influenced in the performance of public duties by the thought of later reaping a benefit from a private individual" (citations omitted). The concerns behind the rule and statute are thus similar; however, they differ in scope and application.

### The Ethics Act

As presently amended the Ethics Act applies to federal and District of Columbia employees in government service on or after July 1, 1979.[8] It disqualifies former government employees to varying degrees from participation in matters for which they were responsible as civil servants. For the purpose of deciding this appeal we find it necessary to address only the prohibitions contained in subsections (a) and (b)(ii) of the statute.

 Subsection (a) prohibits *any* former government employee from representing a party before, or communicating with the intent to influence on behalf of a party with, an agency, court or commission concerning a matter in which the employee personally and substantially participated

---

merit. While the language and scope of these Acts differ, for the purpose of this proceeding the requirements of these Acts were identical. Both Acts require the submission of permit applications for new construction in the Georgetown area to the Commission of Fine Arts and consideration of the Commission's recommendation by the Mayor, but ultimately vest the authority to approve permit applications in the Mayor. The Mayor has delegated his authority under both acts to respondent. Accordingly, we conclude that respondent complied with the requirements of both Acts. *See generally Don't Tear It Down, Inc. v. District of Columbia Dep't. of Hous. and Community Dev.,* D.C.App., 428 A.2d 369, 376–77 (1981).

**7.** The ABA Code of Professional Responsibility, as amended by this court, provides the stan-

dards which govern the practice of law in the District of Columbia. *See* Rule X of the rules governing the Bar of the District of Columbia. Prior to April 30, 1982, when this court amended Disciplinary Rules 9–101, –102 and –103 (*see "Revolving Door,"* D.C.App., 445 A.2d 615 (1982) (en banc)) the ABA version of DR 9–101(B) governed in this jurisdiction.

**8.** Prior to July 1, 1979 the Ethics Act prohibited former federal and District of Columbia employees from participating in matters "in which the United States is a party or has a direct and substantial interest ...." 18 U.S.C. § 207 (1976) (amended 1978). Because the District of Columbia, not the United States, has the direct and substantial interest in the instant proceedings the earlier version of the Ethics Act is inapplicable.

while in government service.[9] Regulations promulgated pursuant to the Act construe this subsection to prohibit physical appearances before an agency, court or commission in an informal or formal setting, transmission of material in connection with a formal proceeding or application, and communication through correspondence and telephone calls. 5 C.F.R. § 737.5(b)(3) (1982). However, the regulations exempt in-house assistance rendered to a private party by a former government employee from the scope of this subsection. *Id.* § 737.5(b)(6).

Subsection (b)(ii) of the Ethics Act prohibits employees *designated* by the Director of the Office of Government Ethics from representing or assisting in the representation of a party through personal presence before an agency, court or commission in a matter in which such employee participated personally and substantially while in government service.[10] Regulations which construe this subsection exempt all activity which does not involve a personal appearance before an agency, court or commission from the scope of this prohibition. Subsection (b)(ii)

does not apply to assistance in connection with an oral or written communication made with an intent to influence which does not involve an appearance. Nor does it bar assistance in preparation for either a formal or informal personal appearance or an appearance by written submission in a formal proceeding where the former employee is not personally present .... [5 C.F.R. § 737.9(b) (1982).]

This subsection thus prohibits only physical appearances before an agency by the former employee.

Both subsections prohibit participation only in matters in which the former government employee participated while in government service. The regulations provide that "[i]n determining whether two particular matters are the same, the agency should consider the extent to which the matters involve the same basic facts, related issues, the same or related parties, time elapsed, the same confidential information, and the continuing existence of an important federal interest." 5 C.F.R. § 737.-5(c)(4) (1982).

**9.** 18 U.S.C. § 207(a) provides in relevant part:

Whoever, having been an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, ... after his employment has ceased, knowingly acts as agent ... for, or otherwise represents, any other person (except the United States), in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person (except the United States) to—

(1) any department, agency, court ... or any civil ... commission of ... the District of Columbia, or any officer or employee thereof, and

(2) in connection with any judicial or other proceeding, application, request for a ruling or other determination, ... controversy, ... or other particular matter involving a specific party or parties in which ... the District of Columbia is a party or has a direct and substantial interest, and

(3) in which he participated personally and substantially as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise, while so employed;

...

....

shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

**10.** 18 U.S.C. § 207(b) provides in relevant part:

Whoever ... (ii) having been so employed and as specified in subsection (d) of this section, within two years after his employment has ceased, knowingly represents or aids, counsels, advises, consults, or assists in representing any other person (except the United States) by personal presence at any formal or informal appearance before—

(1) any department, agency, court, ... or any civil ... commission of ... the District of Columbia, or any officer or employee thereof, and

(2) in connection with any judicial or other proceeding, application, request for a ruling or other determination, ... controversy, ... or other particular matter involving a specific party or parties in which ... the District of Columbia is a party or has a direct and substantial interest, and

(3) ... in which he participated personally and substantially as an officer or employee;

...

....

shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

*Disciplinary Rule 9–101(B)*

 Disciplinary Rule 9–101(B) of the American Bar Association Code of Professional Responsibility provides that "[a] lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." [11] This rule is intended to prohibit conduct which would present even the appearance of impropriety. *Brown, supra* at 1283. *See also Kessenich v. Commodity Futures Trading Commission,* 221 U.S.App. D.C. ——, 684 F.2d 88 (D.C.Cir.1982). Thus, even if an actual conflict of interest is not present we must consider whether the possibility that insider information relevant to the particular matter in controversy was obtained through prior government employment presents the *appearance* of impropriety. *Id.*

In evaluating conflict of interest allegations we must determine whether two or more transactions constitute the same "matter." The Committee on Ethics and Professional Responsibility of the American Bar Association has interpreted the term "matter" in DR 9–101(B) as

> a discrete and isolatable transaction or set of transactions between identifiable parties. Perhaps the scope of the term "matter" may be indicated by examples. The same lawsuit or litigation is the same matter. The same issue of fact involving the same parties and the same situation or conduct is the same matter. By contrast, work as a government employee in drafting, enforcing or interpreting government or agency procedures, regulations, or laws, or in briefing abstract

principles of law, does not disqualify the lawyer under DR 9–101(B) from subsequent private employment involving the same regulations, procedures, or points of law; the same "matter" is not involved because there is lacking the discrete, identifiable transactions or conduct involving a particular situation and specific parties. [ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342 at 6 (1975) (footnotes omitted).]

In *General Motors Corp. v. City of New York,* 501 F.2d 639 (2d Cir.1974) the court reviewed the denial of a motion to disqualify counsel based on a violation of DR 9–101(B), and held that " '[i]n determining whether [a] case involves the same matter as [another], the most important consideration is not whether the two actions rely for their foundation upon the same section of the law, but whether the facts necessary to support the two claims are sufficiently similar.' " *Id.* at 651 n. 22 (quoting *City of New York v. General Motors Corp.,* 60 F.R.D. 393, 402 (S.D.N.Y.1973)).[12]

Formal Opinion 342 also clarifies the meaning of other terms used in DR 9–101(B). The opinion construes "substantial responsibility" as "personal[ ] involve[ment] to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question." Formal Op. 342 at 9. The opinion also discusses the interrelationship of DR 9–101(B) with DR 5–105(D), which extends disqualification of an individual attorney to other attorneys with whom he is affiliated in the practice of law.[13] "So long as the

---

11. On April 30, 1982 this court amended DR 9–101(B), *see "Revolving Door," supra* at 617, to read: "A lawyer shall not at any time accept private employment in connection with any matter *in which he or she participated personally and substantially as a public officer or employee, which includes acting on the merits of a matter in a judicial capacity."*

12. *"Revolving Door," supra,* defines "matter" as "any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." *Id.* at 618.

13. DR 5–105(D) provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment."

As amended by *"Revolving Door," supra,* this rule now provides:

> If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, other than DR 2–110(B)(3) or (B)(4) or DR 6–101(A)(1), or, in appropriate cases, DR 5–101(A), no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue

individual lawyer is held to be disqualified and is screened from any direct or indirect participation in the matter," and from any interest in compensation his associates derive therefrom, an entire firm need not be disqualified. *Id.* at 11.

Finally, in situations where the underlying validity of proceedings is attacked as a result of claimed conflict of interest, the question of applicable sanctions comes into play.

A former government employee who violates the Ethics Act is subject to criminal sanctions. An attorney who violates DR 9–101(B) is subject to discipline by the appropriate court of his jurisdiction.

However, other sanctions may be invoked as a means of protecting the integrity of proceedings before courts and agencies. In *Brown v. District of Columbia Board of Zoning Adjustment, supra,* the Zoning Board denied a motion to disqualify a law firm from participation in a proceeding based on an alleged violation of DR 9–101(B) on the ground that it lacked jurisdiction to interpret and apply the Disciplinary Rules of the American Bar Association. This court disagreed and held that "[t]he agency must decide the motion [to disqualify] to protect the integrity of its own hearings, and to implement the public policy of deterring conflict of interest." *Id.* at 1282. Accordingly, the court remanded the case to allow the Board to determine whether a conflict of interest was present, with instructions "to vacate its decision and conduct a new hearing" if it found a conflict. *Id.* at 1285. *See also Kessenich, supra* 221 U.S.App.D.C. at ——, 684 F.2d at 97–99 (concern for integrity of proceedings and public confidence in legal process may require disqualification of counsel where DR 9–101(B) and Ethics Act violations are present).

An attorney charged with violation of DR 9–101(B) may be disqualified if there is "at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir.1976) (footnote omitted). However, "counsel should not be disqualified merely because of a hypothetical possibility that an innocuous violation of the Code [of Professional Responsibility] might have occurred. The more important consideration . . . is the effect of counsel's conduct on the relevant social interests." *Kessenich, supra* 221 U.S.App.D.C. at ——, 684 F.2d at 99. In evaluating a motion to disqualify based on a violation of DR 9–101(B), therefore, a court or agency must balance the improper conduct against the detrimental impact the attorney's conduct would have upon the integrity of the proceedings and public confidence in legal process. *Id.*

While we have not previously considered whether similar collateral sanctions, *i.e.,* in addition to the criminal penalties prescribed by 18 U.S.C. § 207, should be imposed by a court or agency for Ethics Act violations, the fact that the Ethics Act and DR 9–101(B) advance similar goals suggests that such sanctions should be imposed where practicable. *See Kessenich, supra* at ——, 684 F.2d at 99 ("the possibility that continued representation may be illegal [under the Ethics Act] militates strongly in favor of disqualification in order to maintain the integrity of this court's processes"). However, we need not resolve this question in view of our disposition of petitioners' claims.

*The Evidence*

We turn now to consider whether participation by the three former government employees in preparations for these proceedings raised conflict of interest problems. We need consider at length petitioners' arguments with respect to only two of the three individuals, Robert Mendelson and Louis P. Robbins.[14] Our examination of the

---

such employment, provided that any imputed disqualification or restrictions that attach because a lawyer was a public employee shall be determined under Canon 9.

14. Neither the Disciplinary Rule nor the Ethics Act precluded Ben Gilbert's participation in these proceedings as he is not an attorney and he resigned his government position before the

evidence introduced by petitioners in support of their motion to disqualify leads us to conclude that the motion was properly denied.

Robert Mendelson testified concerning the nature and extent of his responsibilities as a government official and the subsequent services he performed for intervenor in connection with the proceedings before the Mayor's Agent. As Special Assistant to the Secretary of the Interior, he attended meetings of the Georgetown Waterfront Task Force. A National Park Service delegate officially represented the Department of the Interior on this task force; Mendelson functioned as an observer and advisor to the Secretary. He ultimately recommended, along with the National Park Service delegate, that the Secretary approve the development proposal which became the subject of the task force agreement. Mendelson resigned his government position in July 1980 and opened a consulting firm, Mendelson Associates, which intervenor retained to assist in preparing for the hearings before the Mayor's Agent. Thereafter, Mendelson advised intervenor on the selection of experts, solicited experts to testify on intervenor's behalf, and helped prepare testimony that was presented at the hearings. He also met with District of Columbia officials to discuss procedural matters and addressed a meeting of the Chevy Chase Advisory Neighborhood Commission on intervenor's behalf.

As he acknowledged in his testimony before the Mayor's Agent, Mendelson was subject to the prohibitions of the Ethics in Government Act of 1978 since he resigned his government position after July 1, 1979.[15] The restrictions contained in both subsections (a) and (b)(ii) are applicable because his position in the Interior Department has been designated pursuant to subsection (d) of the Act. See 18 U.S.C. § 207(d), 5 C.F.R.

§§ 737.25, 737.33 (1982). However, we find no violation of either subsection on this record.

Advice concerning expert witness selection and testimony and the solicitation of expert witnesses was in-house assistance of the type which neither subsection (a) nor (b)(ii) prohibits. See 5 C.F.R. §§ 737.5(b)(6), 737.9(b) (1982). Similarly, Mendelson's contact with District of Columbia government officials was not the type of communication proscribed by subsection (a), i.e., one made with the intent to influence.[16]

However, the meeting with District government officials was a personal appearance before an officer or employee of a government agency, which subsections (a) and (b)(ii) proscribe. Similarly, his appearance before the Chevy Chase Advisory Neighborhood Commission to speak in support of intervenor's development proposal was an appearance before a civil commission of the District of Columbia within the meaning of both subsections. Nevertheless, these actions did not create a conflict of interest because the design at issue in the instant proceedings is distinct from the proposal and guidelines considered and approved by the task force.

The record does not include a transcript of the task force meetings or a copy of the task force agreement. However, it appears from other exhibits and testimony that the task force did not consider or approve a specific design based on its compatibility with the historic district; rather, it provided guidelines which formed the basis for intervenor's first design. The record includes photographs of the first and second proposals which reveal that the two designs are substantially different.

 We conclude that the task force agreement and guidelines—reflected in intervenor's first design—constituted a mat-

---

1978 amendments to the Ethics Act became effective on July 1, 1979.

**15.** DR 9–101(B) is inapplicable to Mendelson because he is not an attorney.

**16.** Mendelson testified that he attended the meeting with District of Columbia officials "[f]or one reason and one reason only, and that is the logistics of today's hearing, in order to understand what the general timing would be, how many witnesses, what kinds of things they needed to fill out and so forth . . . ."

ter distinct from the design which the Mayor's Agent considered. The regulations which construe the term "matter" in subsections (a) and (b)(ii) of the Ethics Act support our conclusion. *See* 5 C.F.R. § 737.5(c)(4) (1982). Almost two years elapsed between the task force deliberations and agreement and the initiation of the proceedings which considered intervenor's second design. Different parties were involved in the two transactions to some extent. Intervenor, the Commission of Fine Arts, and the Mayor were involved in both matters; however, representatives of other government agencies and private parties helped devise the task force guidelines but did not become directly involved with creation or evaluation of the second design. Finally, the design based on the task force guidelines differed so significantly from the second design that distinct factual issues were clearly involved in any assessment of whether each proposal was compatible with the historic district.

Furthermore, petitioners failed to establish more than a "hypothetical possibility" (*Kessenich, supra* 221 U.S.App.D.C. at ——, 684 F.2d at 98) that Mendelson could have gained confidential information by participating on the task force. Intervenor's representative attended task force meetings and was, therefore, privy to any information that would have been useful in the proceedings before the Mayor's Agent. *See id.; cf. Brown, supra* at 1283 (in determining whether two proceedings involved the same matter for the purpose of evaluating an allegation of conflict of interest under DR 9–101(B), the critical test must be whether the government attorney in the former proceeding had the opportunity to gather information he could otherwise not have gained which he could then use on behalf of the private party in the later proceeding).

Louis P. Robbins, a shareholder and employee of the law firm of Wilkes & Artis, Chartered, intervenor's counsel, testified concerning his duties as a District of Columbia government official and the extent of his involvement in the firm's representation of intervenor in these proceedings.

From January 1973 through June 29, 1979 Robbins served as Principal Deputy Corporation Counsel for the District of Columbia. During that time, for approximately ten months, from July 1978 through April 1979, he also served as Acting Corporation Counsel. He testified that during his tenure in the Corporation Counsel's office he counseled the Zoning Commission concerning the rezoning of the Georgetown waterfront area and represented the Commission in litigation that arose from the rezoning. Robbins also acknowledged that he attended meetings of the Georgetown Waterfront Task Force. He did not recall giving legal advice to the task force; he remembered only that he had discussed transfer of District of Columbia waterfront property at task force meetings. Finally, he testified that during his tenure as a government official he was never involved in considering the compatibility of the design of any project involving intervenor's property with the Georgetown historic district.

Robbins joined Wilkes & Artis in August of 1979 and thereafter learned that the firm represented intervenor in connection with its construction permit application for the waterfront site. He conceded that, to his knowledge, no specific measures had been taken to isolate him from participation in the representation of intervenor and from compensation the firm received for this work. He indicated that his involvement in the instant proceedings was limited to advising his associates concerning procedural matters following the rejection of intervenor's second design by the Commission of Fine Arts, discussing Potomac River flood plain legislation, and advising his associates to prepare their case well since the matter was likely to be appealed in this court. He testified, finally, that his contacts with District of Columbia government officials concerning intervenor's permit application had been limited to casual mention of the matter in conversations which never focused on the merits of the case.

As an attorney licensed in the District of Columbia, Robbins is subject to DR 9–

101(B) as adopted by this court.[17] Although his role in the representation of intervenor in these proceedings was *de minimis,* the apparent failure of Wilkes & Artis to screen him from participation in counseling and compensation arrangements would require disqualification of the entire firm if Robbins himself should have been disqualified under DR 9–101(B). *See* MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 5–105(D) (1979); Formal Op. 342, *supra. Compare "Revolving Door,"* D.C.App., 445 A.2d 615 (1982) (en banc) (containing current versions of these rules).

Robbins' roles in the rezoning proceedings and the task force meetings satisfy the "substantial responsibility" test of DR 9–101(B). *See id.; cf. Kessenich, supra* 221 U.S.App.D.C. at ——, 684 F.2d at 96–97. However, we conclude that the subject of the instant proceedings was not the same "matter" for which Robbins was substantially responsible as a government official.

Proceedings which involve rights in the same property may, of course, constitute the same matter under DR 9–101(B) (*see Brown, supra* at 1283); however, the fact that the same statutory criteria govern factual determinations in two proceedings does not determine whether the proceedings involve the same matter. *See General Motors Corp., supra* at 651 n. 22. Rather, our inquiry must focus on whether the two transactions or proceedings involved the same facts. *Id.*

As a member of the task force, Robbins did not consider a specific design proposal; at most, he participated in formulating an agreement which included guidelines for the design of a mixed use development on intervenor's property. He testified that he was never involved in evaluating the compatibility with the historic district of any design proposal involving intervenor's property. Although intervenor's first design was based on the task force guidelines, the matter at issue before the Mayor's Agent was the compatibility of the *second* design, created by another architect and substan-

tially different from the first, with the historic district. Unique factual issues were involved in evaluating the compatibility of these two distinct proposals. We therefore conclude that the task force agreement and guidelines constituted a matter separate and distinct from the design which was before the Mayor's Agent. *Compare Kessenich, supra* (former government attorney disqualified from representing a private party in an agency adjudication which arose from a complaint which he received and forwarded for adjudication as a government employee).

Moreover, intervenor's representative attended task force meetings. Thus, the Mayor's Agent could properly conclude that not even the appearance of impropriety was raised since intervenor was privy to discussions of the compatibility issue that occurred in the course of the task force deliberations. Thus, Robbins did not have "the opportunity to gather information he could not otherwise have gained which he could then use on behalf of [intervenor] in [a] later proceeding" since intervenor had independent access to this data. *Brown, supra* at 1283.

Similarly, Robbins' participation in the rezoning of the Georgetown waterfront area constituted a different "matter" for the purposes of DR 9–101(B). In addition to satisfying the compatibility criteria of the Old Georgetown Act and the Historic Protection Act, intervenor's design had to comply with applicable zoning regulations. However, compliance with zoning regulations was an issue collateral to the central focus of the proceedings, *viz.,* whether the design was incompatible with the historic district. Furthermore, the rezoning in which Robbins participated did not bear a close factual relationship to the matters at issue in the instant case; it was rulemaking which involved the entire waterfront area, not merely intervenor's property. Robbins is not precluded from accepting private employment involving these regulations "because there is lacking the discrete, identifia-

---

17. Because he resigned from the Corporation Counsel's office before the effective date of the

1978 amendments to the Ethics Act, we do not consider whether his conduct violated that Act.

ble transactions or conduct involving a particular situation and specific parties." Formal Op. 342 at 6.

## IV.

Finally, petitioners contend that the Mayor's Agent failed to address adequately in her findings the concerns of the Commission of Fine Arts about the bulk and density of the proposed development. They also argue that she either failed to articulate the standard by which she evaluated compatibility or improperly considered modern structures in the historic district in assessing the compatibility of intervenor's design.

A. Petitioners do not contend that the evidence is inadequate to support the findings and conclusions of the Mayor's Agent [18] but, rather, that she failed to explain her reasons for disagreeing with the recommendation of the Commission of Fine Arts, which the relevant statutes required her to consider in evaluating intervenor's permit application. *See* D.C.Code 1981, §§ 5–1007(b), –1102. They argue that she merely acknowledged the Commission's objections but failed to address them and, therefore, that her conclusions do not flow rationally from her findings.

Under the DCAPA the Mayor's Agent was required to make findings of fact based on substantial evidence on each material contested issue and then to reach rational conclusions based on these findings. *E.g., Don't Tear It Down, Inc. v. District of Columbia Department of Housing and Community Development,* D.C.App., 428 A.2d 369, 378 (1981). Mere restatements of the testimony of witnesses or recitations of evidence are insufficient substitutes for specific findings, *Newsweek Magazine v. District of Columbia Commission on Human Rights,* D.C.App., 376 A.2d 777, 784 (1977), *cert. denied sub nom. Yette v. Newsweek Magazine,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978), but "where we can sift the findings from the restatement of evidence and

still have findings on the material contested issue(s), we will not set the findings aside." *Don't Tear It Down, Inc., supra* at 379.

It is well established that the DCAPA does not require an agency which has made otherwise proper findings and reached rational conclusions "to explain ... why it favored one witness or one statistic over another." *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission,* D.C.App., 402 A.2d 36, 47 (1979) (*Georgetown II*) (footnote omitted). *Accord, Don't Tear It Down, Inc., supra* at 378. However, "some indication of the reasons for rejecting expert, as opposed to lay, testimony is required." *Bakers Local Union No. 118 v. District of Columbia Board of Zoning Adjustment,* D.C.App., 437 A.2d 176, 179 n. 6 (1981) (citing *Shay v. District of Columbia Board of Zoning Adjustment,* D.C.App., 334 A.2d 175, 178 n. 10 (1975)). *But see Georgetown II, supra* at 47 n. 20.

In the instant case, however, the agency did not credit lay testimony over expert testimony; instead, we are confronted with an instance in which an agency credited expert testimony proffered by an interested party over the expert recommendation of another government agency which it is required by law to consider. At issue is the weight which the Mayor's Agent was required to accord the Commission's recommendation and the extent to which she was required to explain the basis of her disagreement with it. Petitioners argue that the Mayor's Agent was required, and failed, to "articulate clearly and forthrightly the basis of her disagreement with [the] expert body['s] [recommendation]." Petitioners' Brief at 19. Respondent and intervenor, on the other hand, argue that because the Commission is solely an advisory body its views were entitled to no special weight. They contend that the Mayor's Agent adequately addressed the concerns of the Commission and explained the reasons for her disagreement with its recommendation.

18. Accordingly, we do not consider this issue on appeal as "we ... assume the validity of findings and conclusions unquestioned by ... petitioner[s]." *Citizens Ass'n of Georgetown,*

*Inc. v. District of Columbia Zoning Comm'n.,* D.C.App., 402 A.2d 36, 43 n. 10 (1979) (*Georgetown II*).

We hold that the Mayor's Agent was required to demonstrate in her findings that she considered the Commission's recommendation and conclude that she satisfied this requirement in the instant case.

The Old Georgetown Act and the Historic Protection Act require the Mayor to consider the recommendation of the Commission of Fine Arts but ultimately vest authority to issue or deny a permit for new construction in the Mayor. Thus, the function of the Commission is solely advisory; the Mayor need not follow its recommendation, nor is he prevented from receiving additional advice. *Don't Tear It Down, Inc., supra* at 377. However, the statutes do not specify the weight which the Mayor must accord the recommendations of this expert body.

■ The fact that the Commission functions solely in an advisory capacity does not of itself determine the weight its views must be accorded. For example, Advisory Neighborhood Commissions, which are "advisory only," *Kopff I, supra* at 1384, are nevertheless entitled to have issues and concerns raised in their written recommendations accorded "great weight . . . by the governmental agency . . .[;] those issues shall be discussed in the written rationale for the governmental decision taken." D.C. Code 1981, § 1–261(d). In *Kopff I, supra* at 1384, this court interpreted this statute to require that

> an agency . . . elaborate, with precision, its response to the ANC issues and concerns. . . . [T]he agency must articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances . . . .
>
> . . . "[G]reat weight" implies explicit reference to each ANC issue and concern *as such*, as well as specific findings and conclusions with respect to each. [Emphasis in original.]

Thus, the ANC statute does not require special deference to the views of an ANC but, rather, that an agency address its concerns with particularity. *Id.; accord, Bakers Local Union No. 118, supra.* A statute which requires an agency to consider a particular expert recommendation may likewise be construed to impose upon the agency an obligation to consider and address the expert's views explicitly. *See State of Alaska v. Andrus,* 188 U.S.App.D.C. 202, 212 n. 44, 580 F.2d 465, 475 n. 44, *vacated on other grounds,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978) (contrary recommendations of environmental agencies rendered pursuant to statutory mandate "did not *bar* [the Department of the] Interior from proceeding with [planned action]; but they did give rise to a heightened obligation on Interior's part to explain clearly and in detail its reasons for proceeding" (emphasis in original)).

■ Neither the Old Georgetown Act nor the Historic Protection Act explicitly require that the Mayor accord special weight to the expert recommendation of the Commission of Fine Arts. Nevertheless, in light of the Commission's expertise and the statutory mandate that the Mayor consider its recommendation, we hold that the Mayor's Agent must demonstrate that the Commission's recommendation and concerns were considered in order to allow meaningful judicial review and to ensure that statutory requirements have been met. Thus, the findings must reflect that the Commission's views were not ignored, and that they were accepted or rejected on a rational basis.[19] *Cf. Citizens Committee to Save Historic Rhodes Tavern v. District of Columbia Department of Housing and Community Development,* D.C.App., 432 A.2d 710, *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (affirming deci-

---

**19.** Because the Old Georgetown Act and the Historic Protection Act, unlike the ANC statute, do not require that the Mayor accord the Commission's views "great weight," we do not extend the requirements discussed in *Kopff I, supra* to proceedings conducted pursuant to these Acts. Clearly, however, the Mayor's Agent may not summarily reject the recommendation of the Commission as she may reject other testimony, *i.e.,* without explaining "why [she] favored one witness or one statistic over another." *Georgetown II, supra* at 47 (footnote omitted).

sion of Mayor's Agent which disagreed with recommendation of Joint Committee on Landmarks on reasoned basis).

From our review of the findings of the Mayor's Agent in the instant case we are satisfied that the views and recommendations of the Commission of Fine Arts were adequately considered and addressed.

In Finding 21 the Mayor's Agent summarized the position which the Commission had taken with respect to intervenor's proposal:

> [T]he CFA has advised against issuance of a permit for Georgetown Harbour Associates' project . . . because they decided that a project of this size and mass . . . would be incompatible with the historic district. . . . [D]isapproval was not based on the quality of the architectural design, but their feeling that . . . this land should be developed in a manner consistent with open recreation use . . . .
>
> . . . .
>
> . . . It is clear that CFA's principal objection to the Georgetown Harbour Associates' proposal and the basis of their recommendation to deny the subject building permit has been and remains the project's density and mass which they consider incompatible with historic Georgetown and its waterfront.

Contrary to petitioners' assertions on appeal, the Mayor's Agent did not merely summarize the position of the Commission and did not fail to address its concerns.[20] In Finding 19 she considered the proposal in light of applicable zoning laws and regulations and specifically concluded that "the project . . . is of a height, bulk and density lower than that permitted under the zoning laws and regulations for this area." In Finding 33 she addressed the issues of bulk, density and scale more explicitly:

The architects for the Applicant have broken up the roofline, changed direction and juxtaposition of adjoining walls and arranged the elements—three dimensional facades, bays, turrets, elliptical windows, segmented windows, mansard roofs, modulated balconies, etc.—of each building to simulate a group of attached structures. This arrangement is typical of Georgetown building groups generally, although less so of large buildings in the area south of M Street. . . . The penetration of the existing streets into the proposed project diminishes the overall scale thus making the project compatible with existing smaller structures in the historic district.

. . . The project would . . . create no obstruction to . . . views [of the river] nor dominate or overshadow the historic district from the south.

The Mayor's Agent also reviewed the historical uses of the waterfront area and noted in Finding 32 that "[t]he uses surrounding the subject site included a coal yard, gas works, fertilizer plant, manufacturing establishments and retail establishments intermixed with two story rowhouses. From the evidence presented it can be seen that use of the Georgetown Waterfront as a park has no historical precedent." She further concluded in Finding 28 that preferences that the waterfront area be devoted to recreational uses were irrelevant to the issue before her, the compatibility of intervenor's project with the historic district.

Thus, it is clear that the Mayor's Agent not only summarized the concerns and recommendations of the Commission in her findings, but also addressed them in sufficient detail and provided a reasoned explanation for her disagreement with those views.[21]

---

**20.** The parties who opposed intervenor's application expressed similar objections based on the project's bulk and density, which the Mayor's Agent summarized in Finding 23. Her findings sufficiently address not only the concerns of the Commission but the views of these parties as well.

**21.** Petitioners also argue that isolated statements in the findings concerning the K Street facade of the project further support their claim that the Mayor's Agent could not rationally conclude that the design was compatible with the historic district. We disagree. Petitioners distort the significance of this single feature of the design in the assessment of compatibility. The Mayor's Agent properly con-

B. Petitioners contend that the Mayor's Agent failed to articulate the standard by which she assessed the compatibility of intervenor's design and, thus, that she acted arbitrarily and capriciously in concluding that it was compatible with the historic district. They also argue that she improperly considered modern structures in the historic district in evaluating the compatibility of the design.

The Mayor's Agent described the design features of buildings in the Georgetown historic district in Finding 17, then considered intervenor's design in light of these criteria in Finding 33. In Finding 17 she used the statutory definition of design, *viz.,* "exterior architectural features including height, appearance, texture, color and nature of materials," D.C.Code 1981, § 5–1002(4), as the framework within which she defined the features of the Georgetown historic district. Petitioners argue that the standard is deficient in that it fails to address mass and scale. We find no error here as the Mayor's Agent articulated a standard utilizing statutory criteria and, furthermore, addressed the issues of mass, scale and density in other findings. *See* Part IV A, *ante.* The description of the design features of the Georgetown area in Finding 17 provided a clear standard by which to evaluate compatibility and served as an adequate safeguard against arbitrary and capricious action.

At the hearings petitioners' witnesses and one of intervenor's witnesses testified that the design was compatible with modern twentieth century construction in the historic district, not the older historic period structures. Other witnesses who testified in support of intervenor's application stated that the design was compatible with the older historic structures. Petitioners cite another order which the Mayor's Agent issued pursuant to the Historic Protection Act which states that "while the standard for design compatibility ... can recognize ... adjoining structures ... the primary standard must be that of the historic period structures." *In re Application for a New Construction Permit for a Building at 1330 Connecticut Avenue, N.W.,* HPA No. 80–71 at 10 (Revised 1980). They argue that the Mayor's Agent could not apply this standard to the evidence in the instant case and rationally conclude that the design was compatible with the historic district.

Petitioners in effect contest the failure of the Mayor's Agent to explain why she credited the testimony of one set of witnesses over that of another group. The Mayor's Agent was not required to explain why she favored the testimony of witnesses who stated that the project's design was compatible with older historic structures in Georgetown over those who disagreed with this proposition. *See Georgetown II, supra* at 47. On the record before her she could reasonably find, based on substantial evidence, that the design of intervenor's project was compatible with not only twentieth century structures but also with older historic buildings in the area. She could, therefore, apply the standard quoted by petitioners and properly conclude that the design of intervenor's project was compatible with the historic district.

*Affirmed.*

---

sidered the design of the *entire* project in determining whether the structure was compatible with the historic district. Furthermore, while she did state that the K Street facade is a continuous, unbroken wall, she also found that the extension of public streets through the project created the appearance of two buildings and that the project would not overshadow the historic district. These findings are consistent with her conclusion that the project was compatible with the historic district.